IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | CRIMINAL ACTION NO. |
| ) | |
| V. ) | 3:21-CR-006-TCB-RGV |
| ) | |
| NIKIA WAKEFIELD ) | |
| INDIA MIDDLETON ) | |

## **PERFECTED MOTION TO DISMISS INDICTMENT DUE TO SELECTIVE PROSECUTION**

COME NOW the defendants, by and through counsel of record, and file this Joint Motion to Dismiss Indictment Due to Selective Prosecution. In support thereof, they show the Court As follows.

**I.   Procedural history**

On September 7, 2021, Ms. Middleton and codefendant Nikia Wakefield jointly filed a preliminary motion to dismiss the indictment due to selective prosecution. (Doc. 228). Ms. Middleton and Ms. Wakefield subsequently moved to compel the government to provide discovery related to the selective prosecution motion. (Doc. 249). Specifically, they requested the following:

- A list of every defendant prosecuted for fraud related to the CARES Act Programs, including EIDL and PPP fraud, and the defendant's race and gender;

- A list of every individual and/or entity investigated by the Northern District of Georgia for fraud related to the EIDL and/or PPP programs, and the race and gender for those individuals (and in the case of an entity, the race and gender of the person responsible for that entity, such as the CEO or director);

- A list of individuals and/or entities who entered into a civil judgment and/or were allowed to repay the loans/advances without facing criminal charges.

The government opposed the motion, and the defendants filed a reply. (Docs. 259, 267).

The magistrate court denied that motion on December 2, 2021. (Doc. 278). The magistrate court concluded that Ms. Middleton and Ms. Wakefield had not met their burden because (1) statistical data was insufficient to show that similarly situated persons were treated differently; and (2) defendants were not similarly situated to the people and/or entities who had received more favorable treatment. (*Id.* at 7-11). Further, the magistrate court determined that the government had not acted with a discriminatory purpose because the evidence leading to the prosecution was discovered during the execution of a search warrant of a co-defendant's home. (*Id.* at

11-13). Ms. Middleton and Ms. Wakefield filed joint objections on December 15, 2021. (Doc. 291). This Court overruled those objections on February 24, 2022. (Doc. 307).

Without the benefit of additional discovery, Ms. Wakefield and Ms. Middleton now file this perfected motion to dismiss the indictment based on selective prosecution.

## II.  Factual Background

### A.  The Prosecution in this Case

In this prosecution, the government has charged ten individuals with crimes stemming from applications for funds made available through the Coronavirus Aid, Relief, and Economic Security ("CARES") Act, including Economic Injury Disaster Loan ("EIDL") grant and loans and loans under the Payroll Protection Program ("PPP"). Ms. Middleton has been charged with conspiracy to commit wire fraud and two counts of wire fraud, and Ms. Wakefield has been charged with conspiracy, wire fraud, bank fraud, and mail fraud. (Doc. 126).

According to the indictment, defendants Katrina Lawson and Alicia Quarterman conspired with each other to engage in a "money maker" in which Lawson and Quarterman would submit applications for the EIDL

3

advance, which allowed each person to receive up to $10,0000. Lawson allegedly instructed Quarterman to "get some people together" to apply. The individuals in question would receive the $10,000, but would have to pay Lawson and Quarterman $2,000 as a "fee" for completing the application.[1]

Subsequently, Quarterman contacted the remaining individuals in the indictment, and eventually, applications for EIDL advances and/or PPP loans were submitted on their behalf. Ms. Middleton received a $5,500 EIDL loan, but did not receive the EIDL advance or the PPP loan. Ms. Wakefield received the $10,000 EIDL advance.

## B.     Cares Act Prosecutions in the Northern District of Georgia

As of the time of the initial filing, counsel were aware of 50 defendants charged in the Northern District of Georgia with submitting fraudulent applications for EIDL funds and PPP loans; counsel understood that 46 of those defendants were African-American, including all of the defendants in this case. Of the remaining four defendants at that time, counsel believe that three of them were not white, and that only one individual was white.

---

[1]     There is evidence that Lawson and Quarterman charged higher fees to some loan recipients.

Therefore, at the time of the initial motion, 92% of the prosecutions in this district were of African Americans, and 98% of the prosecutions were against people of color. In contrast, just 2% of defendants were white.

Since the initial motion was filed, the government has continued to file charges against additional defendants. Currently, counsel believes that there are 78 defendants being charged with CARES Act fraud, and upon information and belief, that at least 65 are Black, that 71 are people of color, and that 6 are white. The percentages are as follows: 8.5% of defendants are white, 91% of defendants are people of color, and 83.3% are African American.[2]

Additionally, counsel are now aware of a white person who was part of an investigation in the Northern District of Georgia, but who has not been prosecuted. Specifically, an individual C.C. was investigated as part of the case against Maurice Fayne, 1:20-cr-00228-MHC-JKL. Documents from that investigation indicate that she prepared falsified forms to be submitted in support of the PPP application, and that she corresponded with the bank to

---

[2] This includes the cases listed on the Department of Justice's website (https://www.justice.gov/criminal-fraud/cares-act-fraud), the individuals charged in this case, and at least one other case not listed on the website, case number 1:21-cr-98, *United States v. Olivia Ware*.

get the funds from the loan released. Documents also indicate that C.C. has a criminal history that includes fraud crimes, nor forgery. Neither Ms. Middleton nor Ms. Wakefield have previously been convicted of any crimes. Yet, despite her involvement, the government did not charge C.C.

### III. Argument and Citations to Authority

Plainly, the government cannot and does not prosecute every individual who has violated the law. *United States v. Smith*, 231 F.3d 800, 801 (11th Cir. 2000). The government has broad discretion to determine who to charge with a crime, and a "strong presumption of regularity supports those decisions." *Id.* However, the government remains bound by the U.S. Constitution, and the Fifth Amendment's Due Process Clause prohibits the government from "denying to any person the equal protection of the laws." *United States v. Windsor*, 570 U.S. 744, 774 (2013); *see also Smith*, 231 F.3d at 801. Therefore, the decision whether to prosecute an individual "may not be based on an unjustifiable standard such as race, religion, or other arbitrary classification." *United States v. Armstrong*, 517 U.S. 456, 464 (1996).

The government has discriminated against Ms. Middleton and Ms. Wakefield based on their race, gender, and class. Defendants understand that they face a "demanding" burden to establish that their prosecution

violates their right to the equal protection guaranteed by the Constitution. *Smith*, 231 F.3d at 801. To meet this burden, they must present by clear evidence that the prosecution (1) had a discriminatory effect, and (2) was motivated by a discriminatory purpose. *Id.* at 808. The Eleventh Circuit has noted that these two prongs "will often overlap to some extent." *Id.* at 810.

The Court should consider numerous legitimate factors that could have motivated the prosecutorial decisions, including (1) the strength of the case; (2) the prosecution's general deterrence value; (3) the government's enforcement priorities; and (4) the case's relationship to the government's overall enforcement plan. *Id.* at 810. For cases of racial discrimination, the defendant must prove that similarly situated individuals of a different race were not prosecuted. *Id.* at 808.

The government may have a strong case against some defendants in this case, but the evidence against Ms. Middleton and Ms. Wakefield is weak. As previously noted, the government is in possession of text messages showing how Ms. Quarterman and Ms. Lawson recruited unwitting family members and duped them into applying for loans for the benefit of Ms. Quarterman and Ms. Lawson. Certainly, the evidence of intentional fraud committed by accountant C.C. in the above-mentioned case is much stronger

7

than that presented here. The prosecution of Defendants has limited deterrence value because many of those charged have no criminal history and had no inclination to apply for the loans at issue until Ms. Quarterman and Ms. Lawson stepped in to influence them. Thus, the evidence suggests that many of the defendants in this case do not have the inclination to commit future crimes and need not be deterred from other criminal activity. In contrast, C.C. has a criminal history and prosecuting her might have served a specific deterrence effect. Additionally, prosecuting accountants who regularly have access to financial documents and who should understand the typical loan process, would serve more of a general deterrence effect than prosecuting unwitting citizens. As noted, it also appears that the government's enforcement priorities focus almost exclusively on people of color in connection with these loans. It is unclear how this decision to prosecute almost exclusively people of color could fit in with the government's overall enforcement plan. The factors outlined above weigh in favor of dismissal and, as outlined extensively below, Defendants have already shown that similarly situated individuals of a different race were not prosecuted by the Department of Justice.

### A. Defendants Have Shown that Similarly Situated Defendants Were Not Prosecuted.

In the Northern District of Georgia, the publicly available information indicates that the government has almost exclusively charged minorities—and specifically, African Americans—with committing fraud in relation to the CARES Act programs. In the initial days of the pandemic and the PPP program, businesses who took the loans without qualifying were often allowed to return the funds without criminal charges. In other districts, it appears that the government has allowed wealthier, white men and/or corporations to resolve allegations of fraud via civil settlements without criminal prosecutions.[3] Given the percentages established above and the fact that the Department of Justice has allowed other similarly situated defendants to resolve the issues without criminal charges, Ms. Wakefield

---

[3]     U.S. Dep't of Justice, Eastern District of California Obtains Nation's First Civil Settlement for Fraud on Cares Act Paycheck Protection Program, Jan. 12, 2021, available at https://www.justice.gov/usao-edca/pr/eastern-district-california-obtains-nation-s-first-civil-settlement-fraud-cares-act (last accessed March 28, 2022); U.S. Dep't of Justice, Owner of Jet Charter Company Settles False Claims Act Allegations Regarding Misappropriation of Paycheck Program Loan, Aug. 26, 2021, available at https://www.justice.gov/opa/pr/owner-jet-charter-company-settles-false-claims-act-allegations-regarding-misappropriation (last accessed March 28, 2022).

and Ms. Middleton submit that the indictment should be dismissed for selective prosecution.

The Center for Public Integrity has noted that the SBA loan data reveals little about how much of the federal loans nationwide went to minority-owned businesses. It notes that about 86% of the 661,218 loans made for $150,000 or more don't provide any information about race or ethnicity of the business owner. The remaining 14% of loans show that more than 83% were to organizations identified as white-owned businesses, according to an analysis by the Center for Public Integrity. Black-owned businesses received less than 2% of the loans, and 6.6% of the loans went to Hispanic-owned businesses, according to the Public Integrity analysis.[4] A recent study suggested that as much as 15% of these loans could be fraudulent.[5] Based on this data alone, it is clear that the number of African Americans charged with related fraud in this district is

---

[4]  Small Business Loan Data Includes Little About Race. July 6, 2020. https://publicintegrity.org/health/coronavirus-and-inequality/small-business-loan-data-includes-little-on-owners-race-paycheck-protection-program/

[5]  Did FinTech Lenders Facilitate PPP Fraud? John M. Griffin, Samuel Kruger, and Prateek Mahajan. August 17, 2021. https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3906395

out of proportion with the number of African Americans and African American owned businesses that received the CARES Act funds.

Indeed, the defendants have already identified similarly situated defendants who were allowed to either return the funds in question or to enter into civil settlements without facing criminal charges. Specifically, the government gave large companies – who were called out by a public outcry over news of their CARES Act loans – a "safe harbor" deadline within which to return the funds without penalty if they "misinterpreted" the rules of the loan application. (Docs. 249-5, 249-6). This was true despite then-Treasury Secretary Mnuchin's April 2020 admonishment that firms that improperly took these loans could be subject to "criminal liability." (Doc. 249-7). All told, nearly $436 million dollars was returned in lieu of penalties. (Doc. 249-8). Likewise, the government has entered into settlements with other companies in lieu of prosecution. (Doc. 249-9). But in this case, the government has never offered to allow the defendants to simply repay the funds or to enter into a civil settlement. The defendants have therefore met their burden to establish similarly situated individuals who have not been subject to prosecution.

The government has asserted that the defendants were not similarly situated because in this case, the defendants were alleged to have applied for funds when they did not own businesses while the other individuals/entities had businesses but did not comply with the rules or otherwise meet the criteria for the programs in question.[6] But the defendants are not charged with not owning otherwise qualifying businesses; they are charged with various forms of fraud—the same fraud charges facing numerous individuals and/or businesses who were allowed to resolve their cases civilly. (*See* Doc. 249-9). For example, as noted above, an individual identified as C.C. was investigated as part of the case against Maurice Fayne, 1:20-cr-00228-MHC-JKL. Acting as an accountant, she prepared falsified forms to be submitted in support of a PPP application and she corresponded with the bank to get the funds from the loan released. Despite the fact that she did not own, operate, or work for a qualifying business, the government chose not to prosecute her crimes.

---

6      Moreover, there was no requirement that an individual have a registered company in order to avail herself of the relief programs at issue, as independent contractors and other individuals who otherwise qualified were eligible for relief.

12

## B. Defendants Have Shown That This Prosecution was Motivated by a Discriminatory Purpose and it Has Had a Discriminatory Impact.

In denying Defendants' motion to compel discovery, this Court found that the defendants had offered no proof that the government had acted with discriminatory purpose in this prosecution. Doc. 278 at 11; Doc. 307 at 8. However, as the Eleventh Circuit Court of Appeals explained *Gordon*:

> In deciding if a defendant has established selective prosecution, a court must undertake "a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." . . . "Circumstantial evidence of invidious intent may include proof of disproportionate impact." . . . Indeed, under some circumstances proof of discriminatory impact "may for all practical purposes demonstrate unconstitutionality because in various circumstances the discrimination is very difficult to explain on nonracial grounds." Washington [v. Davis], 426 U.S. [229,] 242 [(1976)].

*United States v. Gordon*, 817 F.2d 1538, 1541 (11th Cir. 1987), *vacated in part on reh'g*, 836 F.2d 1312 (11th Cir. 1988).

In *Gordon,* the court held that the district court erred in denying an evidentiary hearing on the defendant's selective-prosecution claim. The defendant claimed that the government prosecuted black political leaders in Alabama's majority-black counties for voting fraud, but did not prosecute

13

county residents who were members of a rival white-dominated political party who were committing similar offenses. 817 F.2d at 1539-41.

Here, as in *Gordon*, the discriminatory impact provides a sufficient basis to support the claim of discriminatory intent. The defendants in this case have offered proof that other individuals and companies were permitted to repay their loans in lieu of criminal prosecution. These individuals are similarly situated to the defendants in this case. This is not a case where defendants are being prosecuted based, in part, on multiple prior crimes; rather, the criteria for prosecution is obtaining CARES Act funds when the individual or company was not entitled to do so. Multiple companies and individuals who also obtained funds when they were not entitled to do so under the program rules were not prosecuted. *See Which Companies are Returning Their PPP Loans? Here's the List*[7]. When 71 out of 78 people prosecuted are people of color, the discriminatory impact is high enough to show discriminatory intent.

The government has claimed that its methods in gathering evidence in this case support a finding that this is not a selective prosecution case. It

---

[7] https://www.nbcnews.com/business/business-news/which-companies-are-returning-their-ppp-loan-here-s-list-n1194566

notes that that the evidence of the alleged fraud was discovered during a drug investigation into one of the co-defendants. Even setting aside the well-known statistics about how African Americans are disproportionately targeted in drug cases, the mere fact that the evidence at issue was discovered during an additional investigation into one of the codefendants does not address the issue here. Most importantly, the government still has the discretion to determine whether or not to charge someone with fraud. Here, the government found text messages between the codefendants, including where one codefendant assured Ms. Middleton that she was eligible for the programs at issue, and still chose to charge Ms. Middleton. Put simply, the fact that the evidence was found during the investigation does not absolve the government of its obligation to ensure that its prosecutions comply with the due process clause. It failed to do so here.

    The government has indeed discriminated against Ms. Wakefield and Ms. Middleton based on their race, gender, and class. For all of the reasons outlined above, they are asking this Court to dismiss the indictment due to selective prosecution.

Respectfully submitted this 28th day of March, 2022.

| | |
|---|---|
| _/s/Saraliene S. Durrett_ | _/s/ Leigh Ann Webster_ |
| SARALIENE S. DURRETT | LEIGH ANN WEBSTER |
| GA Bar No. 837897 | GA Bar No. 968087 |
| SARALIENE SMITH DURRETT, LLC | STRICKLAND WEBSTER, LLC |
| 1800 Peachtree Street | 830 Glenwood Ave. |
| Suite 300 | Suite 510-203 |
| Atlanta, GA 30309 | Atlanta, GA 30316 |
| (404) 433-0855 | (404) 590-7967 |
| ssd@defendingatl.com | law@stricklandwebster.com |
| Attorney for Nikia Wakefield | Attorney for India Middleton |